# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1704

TORY A. HALL,

*Plaintiff-Appellant*,

*v.*

LIFE INSURANCE COMPANY OF NORTH AMERICA,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 97-1448—**John A. Gorman**, *Magistrate Judge*.

ARGUED JANUARY 10, 2003—DECIDED JANUARY 30, 2003

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. As part of her employment with Diagnostek, Inc., Tory Hall was covered by a disability-benefits policy underwritten by Life Insurance Co. of North America (LINA). This perquisite of employment is part of a welfare-benefit plan covered by the Employee Retirement Income Security Act. Hall purchased additional insurance through a professional society to which she belongs; that coverage was furnished under a group certificate issued by New York Life Insurance Co. to the Texas Society of Certified Public Accountants Insurance Trust, on behalf of those accountants who opted in and paid a premium.

Hall became unable to work; both disability carriers commenced paying benefits. LINA, however, reduced Hall's monthly stipend by the amount she received under the New York Life policy. She contends in this suit—properly in federal court under §502(a)(1)(B) of ERISA, 29 U.S.C. §1132(a)(1)(B)—that the reduction is improper. Presiding by agreement of the parties, see 28 U.S.C. §636(c), a magistrate judge entered summary judgment for LINA. Appellate jurisdiction is secure: the judgment was entered on February 25, 2002, and the notice of appeal was filed on March 22. Although Hall also filed in the district court what she styled a motion for reconsideration, and although a timely motion may suspend the finality of the judgment until the district court has acted, see Fed. R. App. P. 4(a)(4)(A)(iv), this motion was filed after the period allowed by Fed. R. Civ. P. 59. It therefore did not affect the judgment's finality, and the notice of appeal took effect immediately on its filing.

The LINA policy sets the monthly benefit at 60% of the employee's former earnings "minus Other Benefits for that month." Other Benefits is a defined term, including not only Social Security and similar governmental income-replacement programs but also "any amounts which the Employee or his dependents receive on account of disability under . . . any group or franchise insurance or similar plan for persons in a group". Clauses of this kind not only reduce the employer's outlay for disability coverage (and thus enable the employer to provide additional fringe benefits from a given budget) but also control the moral hazard of insurance—that is, the chance that the existence of insurance will increase the likelihood of the insured event. People who know that their full income will continue after they stop working may take more risks in their daily lives and will not try as hard to return to work after injury or illness; some insureds will fake the existence of a disability or exaggerate its se-

verity. The closer the disability benefit to 100% of earned income, the greater the moral hazard. As a practical matter even 80% may fully replace lost wages, for persons who no longer work do not incur commuting and related costs, and they enjoy certain tax advantages. The provision in LINA's policy deducting other sources of disability income, so that no more than 60% of earned income is replaced, gives employees an incentive to work if they can. The New York Life policy equates to about 31% of Hall's income with Diagnostek, so if the two benefits cumulate she will receive more than 90% of her former earnings, a dangerously high level from the perspective of moral hazard. But the deduction in LINA's policy is not universal, so we must inquire whether the New York Life policy is a "group or franchise insurance or similar plan for persons in a group".

LINA contends that "group insurance" has a plain meaning: any insurance obtained through a group. New York Life issued its certificate to the Texas Society of Certified Public Accountants Insurance Trust; Hall purchased coverage through that group (and by virtue of her membership in it); the New York Life policy has the word "group" on its cover; and that, LINA insists, is that. Things are not quite this simple, however. "Group insurance" could mean coverage of *whole* groups. This is the sense in which the LINA policy itself is group insurance: it applies to all of Diagnostek's employees. One cannot be an employee without being covered, nor can one be covered under the LINA policy without being a Diagnostek employee. Comprehensive coverage of a group helps insurers control adverse selection—that is, the tendency of persons safer than the norm to drop out of the pool, which raises the average risk and premium and induces still more dropouts. By offering an all-or-none deal, an insurer obtains a pool of normal riskiness and can charge the normal premium. Coverage obtained through the accountants' society is not "group insurance" in *this* sense; individual

accountants choose whether to purchase coverage, and adverse selection is bound to occur.

So which sense does "group insurance" take in this policy? The reference to "franchise insurance" and any "similar plan" reveals what we need to know. According to *Couch on Insurance* §1.29 (3d ed. 2002), "[g]roup insurance is an arrangement by which a single insurance policy is issued to a central entity—commonly an employer, association, or union—for coverage of the individual members of the group. Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies." It looks very much as if the New York Life policy is "group insurance" under this definition; but if it is not, because Hall may have received an individual certificate (and paid premiums directly to New York Life), then it must be "franchise insurance." The inclusion of "franchise insurance" and "similar plans" in the list of Other Benefits shows that an all-in-or-all-out feature is *not* essential to classification of a policy as "group insurance". Hall obtained the New York Life coverage through a policy issued to a professional association, so it fits within Other Benefits.

Hall responds that the LINA policy nonetheless is ambiguous: an accountant who did not consult *Couch on Insurance* could not have known which sense of "group insurance" the LINA policy used. Because federal common law under ERISA (the applicable rules for a case such as this) resolves ambiguities in favor of the plan participant, see *Phillips v. Lincoln National Life Insurance Co.*, 978 F.2d 302, 307-08 (7th Cir. 1992), Hall submits that she should receive unreduced benefits. The *contra proferentum* rule that Hall invokes is, however, just a tiebreaker; it does not entitle insureds to prevail simply because lay readers do not know all technical details of insurance law. See *May Department Stores Co. v. Federal Insurance Co.*, 305 F.3d 597, 600 (7th Cir. 2002). English does not contain

words for all complex economic arrangements; whenever the language lacks a one-to-one mapping of words to ideas (or words to things) there is a potential for ambiguity and confusion. This potential is not enough to justify a pro-insured decision in every case, however; if it did, the cost of insurance would skyrocket and policies would become even longer, more complex, and less digestible, as insurers tried to define *every* term (and then define the words used in the definitions). The Other Benefits section refers, for example, to "the Jones Act"; few non-lawyers know what this is (many non-admiralty lawyers also would draw a blank), but the reference is not ambiguous.

The doctrine that ambiguities are resolved against insurers serves its function when it prevents traps for the unwary. Hall was not ensnared; even a modest degree of diligence would have enabled a CPA to understand that the New York Life policy, offered through a professional group and captioned "Group Insurance," probably would be classified as "group insurance" under the LINA policy. Hall did not read the LINA policy, misunderstand a vague passage or veiled allusion, and only then opt into the New York Life policy; she did not read the LINA policy at all until it was too late. That omission led her to pay for coverage under the New York Life policy, which, as things have turned out, offered her no net benefit, but ERISA does not protect employees against their own imprudence.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*