**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AUSTIN JACOBS,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 21-cv-323 (TSC/GMH)** |
| **RELIANCE STANDARD LIFE INSURANCE COMPANY,** | |
| **Defendant.** | |

**MAGISTRATE JUDGE'S
RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Before the undersigned are the dueling motions of Plaintiff Austin Jacobs ("Dr. Jacobs" or "Plaintiff") and Defendant Reliance Standard Life Insurance Company ("Reliance" or "Defendant"). The key question in this case is whether Reliance properly applied a pre-existing condition limitation in its contract of insurance to deny Dr. Jacobs' claim for long-term disability benefits. Finding that it did, the undersigned accordingly recommends that judgment be entered in Reliance's favor.

Dr. Jacobs became totally disabled in September 2018, only a few months into his new job as an Internal Medicine physician at Georgetown Physicians Group, a subsidiary of MedStar Health ("MedStar"). That much is not in dispute. What happened next, however, spawned this case. When Dr. Jacobs applied for long-term disability benefits from Reliance—MedStar's insurer—his application was rejected. Reliance, citing the Pre-existing Conditions Limitation provision in its policy (the "Reliance Policy" or the "Policy"), denied Plaintiff's claim because he had sought treatment for the conditions he claimed were disabling in the three months prior to the effective date of his coverage under the Reliance Policy. Plaintiff appealed the initial denial, but

Reliance rejected the appeal, as well. After his bid for reconsideration was rebuffed, Dr. Jacobs filed this case, claiming that Reliance's denials of his disability claims were erroneous and violated his rights guaranteed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Now before the Court are the parties' competing motions seeking judgment in their favor. Dr. Jacobs seeks judgment under Federal Rule of Civil Procedure 52 and essentially asks the Court to conduct a trial on the papers. *See generally* ECF No. 17. He asserts that Reliance erroneously applied the pre-existing condition limitation to his claim and requests that Reliance's decision be reversed and that he be awarded benefits. For its part, Reliance moves for summary judgment under Federal Rule of Civil Procedure 56 and resists Dr. Jacobs' bid to use the Rule 52 framework. *See generally* ECF No. 16. While Reliance does not dispute that Dr. Jacobs is totally disabled, it nevertheless maintains that denial of his claim was proper under its policy's Pre-existing Condition Limitation and that it is therefore entitled to judgment. The key issues here, then, are twofold— one procedural and one substantive. Procedurally, the Court must determine whether the parties' motions should be adjudicated under Rule 52 or Rule 56. Because the Court is to review Reliance's decision denying Dr. Jacobs' claim for benefits *de novo*, the undersigned finds that Rule 52 provides the proper framework. As to substance, the ultimate issue is whether Dr. Jacobs' claim for long-term disability benefits was rightly denied under the Reliance Policy's Pre-existing Conditions Limitation. The undersigned finds that it was, and therefore recommends that judgment be entered for Reliance.[1]

---

[1] Judge Chutkan referred this case to the undersigned for full case management up to but excluding trial. The relevant docket entries for purposes of this Report and Recommendation are: (1) the administrative record (ECF No 11-1); (2) Defendant's motion for summary judgment (ECF No. 16-1); (3) Plaintiff's motion for summary judgment (ECF No. 17-1); (4) Defendant's opposition to Plaintiff's motion for summary judgment (ECF No. 18-1); (5) Plaintiff's opposition to Defendant's motion for summary judgment (ECF No. 19); (6) Defendant's reply in support of its motion for summary judgment (ECF No. 20); and (7) Plaintiff's reply in support of his motion for summary judgment (ECF No. 21). The page numbers cited herein are those assigned by the Court's CM/ECF system.

## I.     LEGAL STANDARD

### A.     ERISA and the Standard of Review

ERISA's goal is to safeguard "the interests of participants in employee benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).  Under section 502(a) of the Act, "[i]f a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits . . . [or] to 'enforce his rights' under the plan, or to clarify any of his rights to future benefits."  *Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) (quoting 29 U.S.C. § 1132(a)(1)(B)).

Where, as in this case, "a denial of benefits [is] challenged under [29 U.S.C.] § 1132(a)(1)(B)," the denial must "be reviewed under a *de novo* standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Moore v. Blue Cross & Blue Shield of Nat'l Cap. Area*, 70 F. Supp. 2d 9, 20 (D.D.C. 1999) ("Courts clearly have the authority to construe the language of the contract *de novo* where the denial of benefits does not involve any discretionary authority on the part of the plan administrator.").  "However, when a fiduciary exercises discretionary powers to deny benefits or construe the terms of a plan, a deferential standard of review must be employed."  *Moore*, 70 F. Supp. 2d at 20.  Here, Reliance concedes that the Policy vests in it no discretionary authority, at least with respect to the denial of claims under its Pre-existing Conditions Limitation.  ECF No. 16-1 at 14.  Thus, Reliance's denial of Dr. Jacobs' insurance claim is subject to *de novo* review.  *See, e.g.*, *Mathews v. Nw. Mut. Life Ins. Co.*, No. 18-cv-46, 2019 WL 5578333, at *8 (W.D. Wis. Oct. 29, 2019) ("[Defendant insurer] concedes that there is no language in the plan giving it discretionary

3

authority to determine eligibility.  Thus, the *de novo* standard applies in this case." (internal citation omitted)).  Dr. Jacobs agrees.  ECF No. 17-1 at 7.

### B.      The Parties' Motions Should be Adjudicated Under Rule 52

The parties' initial disagreement concerns which Federal Rule of Civil Procedure should supply the framework for resolution of their motions.  They are not alone in that disagreement. Indeed, "[t]here is a divide among the circuit courts of appeal . . . as to whether Fed. R. Civ. P. 56 is necessarily the appropriate mechanism to resolve a § 1132(a)(1)(B) ERISA claim for denial of benefits."  *Horton v. Life Ins. Co. of N. Am.*, 2015 WL 1469196, at *12 (D. Md. Mar. 30, 2015); *see also Koch v. Metro. Life Ins. Co.*, 425 F. Supp. 3d 741, 746–47 (N.D. Tex. 2019) (outlining four distinct approaches amongst the appellate courts).  The principal dispute is whether appeals from claim denials should be adjudicated on a motion for summary judgment under Federal Rule of Civil Procedure 56—as Reliance contends—or a motion for judgment on the administrative record under Federal Rule of Civil Procedure 52—as Dr. Jacobs argues.  *See Katherine P. v. Humana Health Plan, Inc.*, 939 F.3d 206, 208 (5th Cir. 2020) ("There is an open question whether it is appropriate to resolve ERISA claims subject to de novo review on summary judgment, or whether the district court should conduct a bench trial.").

Dr. Jacobs urges the Court to adjudicate the motions under Rule 52, which permits courts to make findings of fact and conclusions of law following a bench trial.  ECF No. 17-1 at 7–9; Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately.").  Courts have also found that Rule 52 allows for a "trial on the papers" process, the vehicle for which is a motion for judgment on the administrative record (or some similarly-styled pleading).  *Crespo v. Unum Life Insurance Co. of America*, 294 F. Supp. 2d 980, 991 (N.D. Ill. 2003) (discussing the "problem of

reviewing ERISA benefit claims on cross-motions for summary judgment" and strongly suggesting "parties consider proceeding by means of a trial on the papers under" Rule 52(a)); *see also McDowell v. Standard Ins. Co.*, No. 07-cv-1103, 2008 WL 11320066, at *3 (N.D. Ga. Nov. 24, 2008) ("The Court concludes that judgment on the administrative record in ERISA cases involving de novo review is authorized under Rule 52."); *Adair v. El Pueblo Boys' & Girls' Ranch, Inc. Long Term Disability Plan*, No. 06-cv-1343, 2007 WL 2788614, at *1 (D. Colo. Sept. 21, 2007) ("[C]ourts routinely decide ERISA cases on motions for judgment on the administrative record."). That is what Dr. Jacobs proposes. He argues that applying the Rule 52 standard would allow the Court to "determine issues of credibility in the administrative record as it sees fit, and the parties . . . to argue the appropriate weight that should be afforded the evidence." ECF No. 17-1 at 8–9.

Reliance, on the other hand, contends that adjudication under Rule 56—not Rule 52—is proper, and identifies several courts in this Circuit that have applied the Rule 56 standard in assessing benefit denial claims. ECF No. 18-1 at 9–10. The D.C. Circuit has not yet addressed this issue, *see Foster v. Sedgwick Claims Mgmt. Servs., Inc.*, 125 F. Supp. 3d 200, 204 (D.D.C. 2015) (acknowledging no on-point D.C. Circuit precedent), *aff'd*, 842 F.3d 721 (D.C. Cir. 2016), and courts in this district have utilized both the Rule 52 and Rule 56 frameworks. *Compare, e.g.*, *Foster*, 125 F. Supp. 3d at 204 (applying Rule 56), *Pettaway v. Tchrs. Ins. & Annuity Ass'n of Am.*, 699 F. Supp. 2d 185, 198 (D.D.C. 2010) (same), *aff'd*, 644 F.3d 427 (D.C. Cir. 2011), and *Becker v. Weinberg Grp., Inc. Pension Tr.*, 473 F. Supp. 2d 48, 58 (D.D.C. 2007) (same), *with Mobley v. Cont'l Cas. Co.*, 405 F. Supp. 2d 42, 47 (D.D.C. 2005) (applying Rule 52). In the absence of any controlling precedent, the undersigned is persuaded that, at least in this case, the best way to resolve the parties' motions is under Rule 52.

To begin, there are clear shortcomings if the Rule 56 summary judgment standard were applied in this case. The parties agree that the Court must review Reliance's denial of Dr. Jacobs' long-term disability benefits claim *de novo*. ECF No. 16-1 at 14; ECF No. 17-1 at 7. Yet "[t]he *de novo* standard requires the court to make findings of fact and weigh the evidence." *Anderson v. Liberty Mut. Long Term Disability Plan*, 116 F. Supp. 3d 1228, 1231 (W.D. Wash. 2015) (citing *Walker v. Am. Home Shield Long Term Disability Plan*, 180 F.3d 1065, 1069 (9th Cir. 1999) (*de novo* review applies to plan administrator's factual findings as well as plan interpretation)); *see also Lebron v. Boeing Co.*, No. 18-cv-3935, 2020 WL 444428, at *1–2 (S.D. Tex. Jan. 13, 2020) ("When the review is *de novo*, the court must 'independently weigh the facts and opinions in the administrative record to determine whether the claimant has met his burden of showing' an entitlement to benefits." (quoting *Pike v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 1018, 1030 (E.D. Tex. 2019)), *report and recommendation adopted*, 2020 WL 430964 (S.D. Tex. Jan. 28, 2020), *aff'd sub nom. Lebron v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 849 F. App'x 484 (5th Cir. 2021). That is problematic because "under [a Rule 56] motion the court is forbidden to make factual findings or weigh evidence." *Anderson*, 116 F. Supp. 3d at 1231; *see also Mobley*, 405 F. Supp. 2d at 47 ("On summary judgment, the Court may not make credibility determinations or weigh evidence."). And so there is an inherent tension between *de novo* review and the Rule 56 summary judgment standard. *See Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012) (explaining that "[t]here are reasons to think" that a Rule 56 motion for summary judgment is not "the appropriate vehicle for resolution of an ERISA benefits claim" because of the conflict between the *de novo* and Rule 56 standards).

Use of Rule 56 would also add another layer of complexity onto what should be a relatively straightforward *de novo* review of a plan administrator's decision to deny benefits. *See Campbell*

*v. Hartford Life & Accident Ins. Co.*, No. 17-cv-80193, 2018 WL 4963118, at *5 (S.D. Fla. Oct. 15, 2018) ("In reviewing a benefits-denial decision, a district court operates as an appellate tribunal."). That is especially true in cases where, as here, the parties are litigating on an agreed-upon administrative record. In such cases, "Rule 56 practice seems to be an extra and unnecessary step—and one that can result in two appeals rather than one." *Doyle v. Liberty Assurance Co. of Boston*, 542 F.3d 1352, 1363 n.5 (11th Cir. 2008). That is because "there is no right to a jury trial under ERISA." *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003). Thus, since "the task of resolving . . . factual disputes ultimately falls to the court," litigating via summary judgment motion just "forces the parties to take an additional step in order to secure final judgment." S*oucy v. First Unum Life Ins. Co.*, No. 3:07-cv-467, 2011 WL 13047471, at *1 (D. Conn. Mar. 17, 2011). Doing so would be inconsistent with "[a] primary goal of ERISA," which is "to provide a method for workers and beneficiaries to resolve disputes over benefits inexpensively and expeditiously." *Perry v. Simplicity Eng'g*, 900 F.2d 963, 967 (6th Cir. 1990). "It seems sensible, then, for courts to reach the merits of motions for judgment on the administrative record despite the existence of the type of factual dispute that would normally preclude summary judgment." *Soucy*, 2011 WL 13047471, at *1.

Relatedly, "[a] trial on the papers process" provides added certainty: "It is certain to result in a decision for one party rather than present the risk of a non-decision if the cross-motions for summary judgment are both denied." *Crespo*, 294 F. Supp. 2d at 991–92. Further, "[i]f the decision resulting from a trial on the papers is reversed on appeal, it is unnecessary to remand for a new trial, which may occur on a reversal from cross-motions for summary judgment." *Id.* So, in addition to the clashes between the de novo review and summary judgment standards, Rule 56 motions would also seem to unnecessarily complicate the already "labyrinthine complexities of

7

ERISA law and practice." *Foltz v. U.S. News & World Rep.*, 760 F.2d 1300, 1308 (D.C. Cir. 1985).

Reliance's objection to the use of Rule 52 to resolve the parties' dispute, on the other hand, is not persuasive. It is true, as Reliance contends, that the parties are before the Court "on [an] undisputed factual record." ECF No. 18-1 at 10. But the facts to be derived from that record—including things as basic as the Reliance Policy's "Effective Date"—are hotly contested, making summary judgment less palatable.[2] Indeed, that the parties are proceeding on an agreed-upon record militates against using the Rule 56 summary judgment framework, not for it. *See Ogletree v. Aetna Life Ins. Co.*, 508 F. Supp. 3d 1318, 1321 (N.D. Ga. 2020) ("[I]n cases based on an agreed-upon administrative record, 'Rule 56 practice seems to be an extra and unnecessary step—and one that can result in two appeals rather than one.'" (quoting *Doyle*, 542 F.3d at 1363 n.5)), *appeal docketed* No. 21-10081 (11th Cir. Jan. 6, 2021). Nor does Reliance address the inherent tension between the Rule 56 standard and the de novo review it says the undersigned must conduct.[3]

---

[2] Perhaps most tellingly, Reliance's own briefing invites the undersigned to weigh the differing interpretations of its Policy in its favor—something the undersigned cannot do when deciding a motion for summary judgment, but that may be done, where appropriate, when conducting a "trial on the papers." For instance, Reliance acknowledges the parties' dispute concerning the Policy's "Effective Date," but then asks the undersigned to resolve the discrepancy in its favor. *See* ECF No. 20 at 6. That the undersigned simply cannot do on summary judgment. *See, e.g.*, *Bank of Am. Nat'l Trust and Savings Assoc. v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985) ("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact. Summary Judgment is therefore inappropriate."); *Consol. Edison, Inc. v. Ne. Utilities*, 249 F. Supp. 2d 387, 411 (S.D.N.Y. 2003) ("'Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, then the interpretation of the contract becomes a question of fact' and cannot be resolved on a motion for summary judgment." (quoting *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir. 1995))), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005); *Geogas Trading, S.A. v. Mitsui & Co. (U.S.A.)*, No. 95-cv-910, 1996 WL 71505, at *5 (S.D.N.Y. Feb. 20, 1996) ("These differing interpretations of the Contract present triable issues of fact that cannot be decided on a summary judgment motion. The Court's role on summary judgment is not issue determination, but issue spotting." (internal citations omitted)).

[3] More, the cases Reliance cites from this Court do not preclude the use of Rule 52 and, in any event, are distinguishable. In *Foster*, this Court noted the aforementioned Circuit split on how to resolve appeals of ERISA-governed benefit denials, but proceeded under Rule 56 "[b]ecause the D.C. Circuit has not ruled on the question and because both parties endorse the use of Rule 56." 125 F. Supp. 3d at 204. Not so here, where one party asserts that the case should be adjudicated under Rule 52 and only accedes to Rule 56 in the alternative. *See* ECF No. 17-1 at 7–9. Further, other courts have reasoned that the lack of on-point circuit authority opens up the opportunity to consider the application of Rule 52 "[i]n the event of a material dispute of fact." *Horton*, 2015 WL 1469196, at *13 (reasoning

Thus, it is unsurprising that a great many courts have found that Rule 52 provides a better framework than Rule 56 for de novo review of a denial of disability benefits governed by ERISA. Courts in the Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits have all endorsed the use of Rule 52—and specifically, a "trial on the papers"—in disability benefit denial cases where the standard of review is de novo. *See, e.g.*, *Muller*, 341 F.3d at 124 ("[T]he decision on the motion for judgment on the administrative record, or the District Court's de novo review of the parties' submissions and resolution thereof, can best be understood as essentially a bench trial on the papers with the District Court acting as the finder of fact. Since there is no right to a jury trial under ERISA this form of bench trial [is] entirely proper." (internal citations and quotation marks omitted)); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999) (en banc) ("[I]n its discretion . . . the district court may try the case on the record that the administrator had before it."); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (finding that on *de novo* review of an ERISA benefits claim, the "appropriate proceeding[ ] . . . is a bench trial and not the disposition of a summary judgment motion"); *Pike*, 368 F. Supp. 3d at 1071 ("Using Rule 52 is

---

that, "in the absence of explicit Fourth Circuit guidance rejecting Rule 56 as a valid standard upon which to evaluate a . . . ERISA claim, [it] may well be appropriate, so long as the court is satisfied that there is no *genuine dispute of material fact.* In the event of a material dispute of fact, however, resolution under Rule 52 appears appropriate."). Importantly, neither the District Court nor the D.C. Circuit in *Foster* took a position on the propriety of utilizing the Rule 52 framework. *See Foster*, 842 F.3d 721; *Foster*, 125 F. Supp. 3d at 204. Nor did this Court in *James v. Int'l Painters & Allied Trades Indus. Pension Plan*, 844 F. Supp. 2d 131, 141 (D.D.C. 2012), *aff'd*, 738 F.3d 282 (D.C. Cir. 2013), which also used summary judgment motions to resolve an appeal to the denial of ERISA-governed disability benefits. Critically, *James* was decided under an abuse of discretion standard of review, which is more amenable to the traditional summary judgment framework. *Id.* at 141; *see also Josef K. v. California Physicians' Serv.*, 477 F. Supp. 3d 886, 896 n.4 (N.D. Cal. 2020) ("Where, as here, a court applies an abuse of discretion standard, courts frequently treat parties' motions as ones for summary judgment under Rule 56."); *cf. Frank v. Liberty Life Assurance Co. of Bos.*, No. 15-cv-124, 2017 WL 2172320, at *2 (D. Md. Mar. 1, 2017) ("District Courts that have commented that resolution under Rule 52 is inappropriate have done so in the context of reviewing an administrator's decision under an abuse of discretion standard, where a court's independent fact finding would be 'inappropriate and in derogation of the required deference.'" (quoting *Tobey v. Keiter, Stephens, Hurst, Gary & Shreaves*, No. 3:13-cv-315, 2014 WL 61325, at *3 n.2 (E.D. Va. Jan. 7, 2014), *aff'd*, 585 F. App'x. 837 (4th Cir. 2014))). The same is true of *Pettaway v. Teachers Insurance & Annuity Association of America*, 699 F. Supp. 2d 185, 201 (D.D.C. 2010), *aff'd*, 644 F.3d 427 (D.C. Cir. 2011). Like *James*, the court in *Pettaway* reviewed the plan administrator's denial of benefits for abuse of discretion, which accommodates the Rule 56 summary judgment standard far better than does de novo review.

9

effective in the ERISA context because courts may resolve factual disputes and issue legal findings without the parties resorting to cross motions for summary judgment."); *Frank*, 2017 WL 2172320, at *2 ("The Court finds that where, as is the case here, the Court is conducting a *de novo* review of a denial of benefits, and the record contains a multitude of disputed facts, resolution of the case under Rule 52 is the appropriate analytical route."); *Walker-Hall v. Am. Int'l Life Assurance Co. of New York*, 788 F. Supp. 2d 1355, 1357 (M.D. Fla. 2011) ("The court's final adjudication of [p]laintiffs' [long term disability benefits] claim should be pursuant to a Motion for Final Judgment under Rule 52 . . . based on review of the administrative record, rather than a Rule 56 Motion for Summary Judgment.").

For all these reasons, the undersigned will construe the parties' motions as motions for judgment on the administrative record and resolve the case under Rule 52. *See, e.g.*, *Fisher v. Cont'l Cas. Co.*, No. 11-cv-111, 2012 WL 3100560, at *2 (D. Mont. July 30, 2012) ("In an ERISA case under 29 U.S.C. § 1132(a)(1)(B) where the plaintiff is entitled to a bench trial on the record, the parties' cross motions for judgment may be decided under Fed. R. Civ. P. 52 even if the parties styled their motions as ones for summary judgment."); *Hill v. Hartford Life & Accident Ins. Co.*, 1:08-cv-754, 2009 WL 10664970, at *1 (N.D. Ga. Sept. 16, 2009) (treating the plaintiff's summary judgment motion on his ERISA claims as a trial on the papers pursuant to Rule 52).

Under that Rule, in an action tried without a jury, the Court "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1); *see Neumann v. Prudential Ins. Co. of Am.*, 367 F. Supp. 2d 969, 980 (E.D. Va. 2005) ("[J]ust like any other bench trial, Rule 52(a) requires that the district court make explicit findings of fact and conclusions of law."). "In setting forth the findings of fact, the court need not address every factual contention and argumentative detail raised by the parties, [n]or discuss all evidence presented at trial." *Yah*

10

*Kai World Wide Enters., Inc. v. Napper*, 292 F. Supp. 3d 337, 344 (D.D.C. 2018) (alteration in original) (quoting *Moore v. Hartman*, 102 F. Supp. 3d 35, 65 (D.D.C. 2015)).  "The Court is neither 'require[d]' nor 'encourage[d]' 'to assert the negative of each rejected contention as well as the affirmative of those which they find to be correct.'"  *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 188 F. Supp. 3d 22, 34 (D.D.C. 2016) (alterations in original) (quoting *Schilling v. Schwitzer–Cummins Co.*, 142 F.2d 82, 84 (D.C. Cir. 1944)), *aff'd*, 743 F. App'x 457 (D.C. Cir. 2018).  Instead, the Court need only "make brief, definite, pertinent findings and conclusions on the contested matters" that are "sufficient to allow the appellate court to conduct meaningful review."  *Yah Kai World Wide Enters.*, 292 F. Supp. 3d at 344 (quoting *Wise v. United States*, 145 F. Supp. 3d 53, 57 (D.D.C. 2015)); *see also* Fed. R. Civ. P. 52(a), advisory committee's note to 1946 amendment (explaining that "a judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts").  Such findings and conclusions "may be incorporated in any opinion or memorandum of decision the court may file."  *Defs. of Wildlife, Inc. v. Endangered Species Sci. Auth.*, 659 F.2d 168, 176 (D.C. Cir. 1981).

Further, in the ERISA context, the "trial on the papers" process is somewhat "[d]ifferent from a traditional bench trial" because the court's "findings and conclusions are made only from the paper record before the plan administrator without additional oral evidence submitted in court."  *Neumann*, 367 F. Supp. 2d at 980.[4]  "For claims seeking benefits under an ERISA plan . . . 'at trial

---

[4] As such, Dr. Jacobs' affidavit (ECF No. 17-2) will not be considered here.  The cases on which he relies to argue otherwise are not persuasive.  *Quesinberry v. Life Ins. Co. of N. Am.* "conclude[s] that courts conducting *de novo* review of ERISA benefits claims should review only the evidentiary record that was presented to the plan administrator or trustee except where the district court finds that additional evidence is necessary for resolution of the benefit claim." 987 F.2d 1017, 1026–27 (4th Cir. 1993).  One such situation is where, as here, there is a need for "evidence regarding interpretation of the terms of the plan rather than specific historical facts." *Id.* at 1027.  Yet Dr. Jacobs' affidavit does not shed light on the meaning of any of the Reliance Policy's key terms.  Rather, it discusses Dr. Jacobs' disability, his now-withdrawn claim that Reliance shifted the basis for its denial of his claim, his communications with MedStar concerning his application for long-term disability benefits, and his belief that he was covered by the Reliance Policy.

the plaintiffs would bear the burden of proving [the ERISA beneficiary's] entitlement to the benefits of the insurance coverage, and the defendant [insurer] would bear the burden of establishing [the beneficiary]'s lack of entitlement . . . .'" *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (second through fourth alterations in original) (quoting *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)); *see also McFarland v. Unum Life Ins. Co. of Am.*, No. 20-cv-1823, 2022 WL 306069, at *5 (W.D. Wash. Feb. 2, 2022) ("When a district court reviews a denial of benefits under the de novo standard of review, the claimant bears the burden of proving that he is entitled to benefits under his plan."), *appeal docketed*, No. 22-35198 (9th Cir. Mar. 7, 2022).  "The same standard applies in this 'paper trial' under Rule 52." *Contreras v. United of Omaha Life Ins. Co.*, 250 F. Supp. 3d 338, 342 (N.D. Ill. 2017).  The standard of proof is preponderance of the evidence.  *See, e.g.*, *Bunger v. Unum Life Ins. Co. of Am.*, 299 F. Supp. 3d 1145, 1157 (W.D. Wash. 2018) ("The claimant must demonstrate disability under the terms of the plan by a preponderance of the evidence.").  Finally, Rule 52 "'permits the court to make a determination in accordance with its own view of the evidence' and does not require the court to draw inferences in favor of one party or the other." *3E Mobile, LLC v. Glob. Cellular, Inc.*, No. 14-cv-1975, 2019 WL 1253455, at *2 n.5 (D.D.C. Mar. 19, 2019) (quoting *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 963 n.1 (5th Cir. 2016)), *aff'd*, 798 F. App'x 651 (D.C. Cir. 2020).

---

ECF No. 17-2 at 2–3.  The information therein is hardly "necessary for resolution of the benefit claim." *Quesinberry*, 987 F.2d at 1027.  *Hurley v. Life Ins. Co. of N. Am.*, No. 04-cv-252, 2006 WL 1883406 (D.D.C. July 9, 2006) is focused on the propriety of discovery in ERISA cases—something Dr. Jacobs does not request here—and in any event merely reiterates the inapplicable points from *Quesinberry*.  Dr. Jacobs also cites the Supreme Court's decision in *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105 (2008), but he concedes that the case focused on the plan administrator's conflict of interest and/or bias.  ECF No. 21 at 3–4.  No such conflict of interest or bias has been alleged here.  Finally, while Dr. Jacobs accurately cites *Helton v. AT&T*, 709 F.3d 343 (4th Cir. 2013), he does not explain how or why it has any force in this case.

## II.      FINDINGS OF FACT

### A.      Dr. Jacobs' Disability

Dr. Jacobs' disability stems from a November 2017 gastric sleeve surgery.  ECF No. 1 at 4.  Unfortunately, Dr. Jacobs suffered cardiac arrest during the procedure, and his post-operative recovery has been marred by a number of serious complications.  *See, e.g.*, *id.*; ECF No. 11-1 at 173, 301–02.  Those complications, which include gastric leaking, infections, and abdominal abscesses, resulted in a nearly two-month-long hospitalization in March, April, and May 2018.  *See, e.g.*, ECF No. 11-1 at 173, 301–02.  Dr. Jacobs was discharged from the hospital on May 16 but was readmitted several days later on May 19 for "pain management, tube feeding, wound care, and IV antibiotics."  *Id.* at 301.  He was hospitalized again on June 20 after a drainage tube inserted during the post-operative process became dislodged.  *Id.* at 203, 302.  He was discharged on June 22 to continue tube feeding and wound care at home.  *Id*.  Dr. Jacobs was set to begin work as an Internal Medicine physician at Georgetown Physicians Group on July 1, 2018, but, due to the ongoing surgical complications, that did not happen.  Instead, Dr. Jacobs was back in the hospital by July 11 to address a collection of fluid around his spleen, at which time a new stent was inserted.  *Id.*  By September 8, 2018 (at the latest[5]), Dr. Jacobs was well enough to start work at Georgetown Physicians Group.  ECF No. 17-1 at 1, 9.  His tenure was short-lived.  Dr. Jacobs was admitted to the hospital twice in September to address continued complications from the November 2017 surgery.  ECF No. 11-1 at 203, 302.  He last worked on September 16, 2018, and on September 17 Plaintiff submitted an application for disability benefits under the Reliance Policy.  *Id.* at 149–50.

---

[5] As will be explained, the parties do not agree on the date that Dr. Jacobs returned to work for Georgetown Physicians Group.  Reliance says the date was August 13, 2018.  *See, e.g.*, ECF No. 18-1 at 5–6.  Dr. Jacobs says it was September 7 or 8, 2018.  ECF No. 17-1 at 1, 7, 9.  Because the analysis and ultimate outcome is the same whether the date was August 13 or September 7/8, the dispute over precisely when he returned to work is not material and need not be resolved.

It appears that Plaintiff's initial application was for short-term disability benefits, but the record indicates that by mid-December 2018 he sought long-term benefits.  *Id.* at 149.

**B.      Dr. Jacobs' Employment History and the Relevant Policy Language**

It makes sense to pause here for a moment to review Dr. Jacobs' employment history and the key provisions of the Reliance Policy.  Dr. Jacobs' employment at MedStar began in June 2014, when he was hired as a resident.  *Id.* at 135.  At that time, Dr. Jacobs was not covered under the Reliance Policy.  Instead, as a resident, he was covered under a policy provided by Guardian Life Insurance Company (the "Guardian Policy").  *Id.* at 97.  In fact, following the November 2017 gastric sleeve surgery and before he became covered under the Reliance Policy, Dr. Jacobs received some disability payments under the Guardian Policy.  *See, e.g.*, ECF No. 16-1 at 7, 8; ECF No. 18-1 at 7; ECF No. 20 at 7.  After several years as a resident, Dr. Jacobs was offered and accepted a full-time position as an Internal Medicine physician with Georgetown Physicians Group—a MedStar affiliate—which was to start July 1, 2018.  ECF No. 11-1 at 238–39.  Once he transitioned from resident to physician, Dr. Jacobs also transitioned from the Guardian Policy to the Reliance Policy, which was offered to physicians.

Several provisions of the Reliance Policy are critical to the outcome of this case.  First is the effective date of the Reliance Policy.  The Policy's "Effective Date" reads, "January 1, 2011, as amended through February 1, 2018."  *Id.* at 1.  On the same page, the Policy also indicates that its "Anniversary Dates" are "January 1, 2012 and each January 1st thereafter."  *Id.*  That page also includes the following language:  "This Long Term Disability Policy amends the Long Term Disability Policy previously issued to you by us. It is issued on June 4, 2018."  *Id.*

Next is the language concerning the effective date of Dr. Jacobs' individual coverage under the Reliance Policy.  The Policy provides that "[t]he insurance for an Eligible Person will not go

14

into effect on a date he/she is not Actively at Work because of a Sickness or Injury. The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class[.]" *Id.* at 18. The Reliance Policy has numerous classes of "Eligible Persons," including one that is applicable to Dr. Jacobs, Class 8, which covers "active, Full-time employee[s] of Georgetown Physicians Group." *Id.* at 7, 135.

At the core of the parties' dispute is the Pre-existing Conditions Limitation. That provision states:

> Benefits will not be paid for a Total Disability: (1) caused by; (2) contributed to by; or (3) resulting from[ ] a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured. "Pre-Existing Condition" means any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the three (3) months immediately prior to the Insured's effective date of insurance. The Pre-existing Condition limitation does not apply to any condition named in the application.

*Id.* at 26. Thus, the Pre-existing Conditions Limitation contains a a three-month look-back period and twelve-month limitation period. That is, a policyholder who claims total disability cannot collect benefits for sickness or injury "caused by[,] contributed to by[,] or resulting from" conditions for which they sought treatment in the three months prior to the effective date of their insurance (the "three-month look-back period") *unless* they have been covered under the Policy for twelve months plus one day on which they are "Actively at Work" (the "twelve-month limitation period").

The Policy defines "Sickness" as an "illness or disease causing Total Disability which first manifested while insurance coverage is in effect for the Insured." *Id.* at 12. An "Injury" is "bodily Injury resulting directly from an accident, independent of all other causes. The Injury must cause Total Disability which begins while insurance coverage is in effect for the Insured." *Id.* at 11.

15

And "Treatment" is "care consistent with the diagnosis of the Insured's Injury or Sickness that has its purpose of maximizing the Insured's medical improvement.  It must be provided by a Physician whose specialty or experience is most appropriate for the Injury or Sickness and conforms with generally accepted medical standards to effectively manage and treat the Insured's Injury or Sickness." *Id.* at 12.

Relatedly, there is a Pre-existing Conditions Limitation Credit which provides that "[i]f an employee is an Eligible Person on the Effective Date of this Policy, any time used to satisfy the Pre-existing Conditions Limitation of the prior group long term disability insurance plan will be credited towards the satisfaction of the Pre-existing Conditions Limitation of this Policy." *Id.* at 14.  The term "prior group long term disability insurance plan" is not defined or further explained in the Policy.

Finally, there is the Policy's Transfer of Insurance Coverage provision, which, in relevant part, provides the following:

> If an employee was covered under any group long term disability insurance plan maintained by you prior to this Policy's Effective Date, that employee will be insured under this Policy, provided that he/she is Actively At Work and meets all of the requirements for being an Eligible Person under this Policy on its Effective Date.
>
> If an employee was covered under the prior group long term disability insurance plan maintained by you prior to this Policy's Effective Date, but was not Actively at Work due to Injury or Sickness on the Effective Date of this Policy and would otherwise qualify as an Eligible Person, coverage will be allowed under the following conditions:
>
> > (1) The employee must have been insured with the prior carrier on the date of the transfer; and
> > (2) Premiums must be paid; and
> > (3) Total Disability must begin on or after this Policy's Effective Date.

*Id.* at 14.

16

**C.      The Administrative Process**

Dr. Jacobs submitted a claim for long-term disability benefits in December 2018 and claimed that he had been disabled since September 17, 2018, due to "post gastric sleeve leak with infection."  ECF No. 11-1 at 149–50.  By letter dated May 2, 2019 (the "Initial Denial Letter"), Reliance denied Dr. Jacobs' claim under the Policy's Pre-existing Conditions Limitation.  *Id.* at 135–137.  Reliance found that Dr. Jacobs was "Actively at Work" for MedStar starting on August 13, 2018, and therefore sought to determine whether he had sought treatment for his disabling condition during the Policy's three-month look-back period prior August 13—that is, from May 13 to August 13.  *Id.* at 136.  It found that he had.  Specifically, Reliance determined that Dr. Jacobs was "hospitalized due to [his] disabling condition of complications of gastric resection including a gastric leak and cutaneous fistula and peritoneal abscess from March 21, 2018 through May 16, 2018 and then readmitted on May 19, 2018."  *Id.*  On that basis, Reliance concluded that Dr. Jacobs' disabling condition to be pre-existing and denied his claim on that basis.  *Id.*

Dr. Jacobs appealed the denial by letter dated October 28, 2019.  *Id.* at 294–96.  Dr. Jacobs' appeal letter did not address the pre-existing condition issue on which Reliance's denial rested.[6] Instead, Dr. Jacobs' letter explained that he had, in fact, actively worked as a physician for MedStar and had satisfied the waiting period for coverage eligibility.  *Id.* at 295.  Yet, as explained, the Initial Denial Letter did not deny Dr. Jacobs' claim on those grounds.  Indeed, Reliance acknowledged that, as of August 13, 2018, Dr. Jacobs was "actively at work" for MedStar.  *Id.* at 136.

In any event, as part of its second-level review, Reliance sent Dr. Jacobs' file to Dr. Morris P. Elevado for an independent evaluation of two questions:  (1) "Was there any sickness or injury

---

[6] Dr. Jacobs explains that he did not address the pre-existing condition issue because he did not have a full copy of the Initial Denial Letter, but says "this was of no fault by Reliance."  ECF No. 21 at 1–2.

for which [Dr. Jacobs] received medical Treatment . . . , consultation, care or services, including diagnostic procedures, or [took] prescribed drugs or medicines, during the time period of 05/13/18 to 08/13/18?" and (2) "If yes, did this sickness or injury cause, . . . contribute to, or result in [Dr. Jacobs'] condition on 09/17/18?" *Id.* at 301–04. In a report dated November 8, 2019, Dr. Elevado answered both questions in the affirmative. *Id.* As to the first query, Dr. Elevado found that Dr. Jacobs was hospitalized from March 21 to May 16, 2018, and then re-hospitalized on May 19. *Id.* at 303. Dr. Elevado explained that the May 19 hospitalization was partially related to various infections for which Dr. Jacobs received intravenous ("IV") antibiotics. *Id.* Dr. Elevado also found that hospitalization was required on June 20, 2018, when a drain in Dr. Jacobs' abdomen became dislodged. *Id.* The drain was originally placed in Dr. Jacobs' abdomen during the March to May hospitalization and was intended to address continued gastric leaking. *Id.* at 302. Dr. Elevado then discussed Dr. Jacobs' subsequent readmission to the hospital on July 11 as a result of a collection of fluid in and around his spleen, and that a stent was inserted at that time. *Id.* at 303. Finally, Dr. Elevado noted imaging from July and August 2018 showing, among other things, an abscess cavity in and around Dr. Jacobs' spleen and irregularities in the soft tissue of his abdomen. *Id.*

Moving to the second inquiry, Dr. Elevado concluded that the conditions for which Dr. Jacobs received treatment from May 13 to August 13, 2018 caused, contributed to, and/or resulted in his disabling condition. Dr. Elevado found that Dr. Jacobs had been treated for the abscesses around his spleen during the relevant three-month window, including with "antibiotics and drain placement." *Id.* In August 2018, imaging showed that an abscess had recurred. *Id.* And while Dr. Jacobs was improving, the abscesses "persisted up until his September admissions to the hospital." *Id.* Thus, Dr. Elevado concluded that the condition for which Dr. Jacobs claimed

18

disability was "addressed" between May 13 and August 13, 2018, which resulted in a partial, but not complete, improvement in the condition by September 17—the onset date of his disability. *Id.*

Reliance sent Dr. Elevado's report to Dr. Jacobs on November 14, 2019. *Id.* at 140. In the transmittal letter, Reliance instructed Dr. Jacobs to "provide any additional information you would like considered no later than November 29, 2019." *Id.* The letter further informed Dr. Jacobs that Reliance would "proceed with [its] determination based upon the information on file at that time or if you respond prior to this date." *Id.* Dr. Jacobs sent a letter to Reliance on November 27 stating that he had "no specific information to add to" Dr. Elevado's report. *Id.* at 308–09. However, the letter did outline additional steps Dr. Jacobs was taking to address his health issues, including potential surgery. *Id.* at 308. That response was sent to Dr. Elevado, who determined in a supplemental report dated December 6, 2019, that the additional information contained in Dr. Jacobs' November 27 letter did not change his original opinion. *Id.* at 325–26.

Reliance then rendered a final denial of Dr. Jacobs' request for long-term disability benefits on December 16, 2019 (the "Appeal Denial Letter"). *Id.* at 141–46. In the Appeal Denial Letter, Reliance made the same key findings it did in the Initial Denial Letter. Reliance first found that Dr. Jacobs' coverage under the Reliance Policy became effective on August 13, 2018, which is the date on which "he was Actively at Work for one (1) full day." *Id.* at 143. So, for purposes of determining the application of the Pre-existing Conditions Limitation, the three-month look-back period, as calculated in the Appeal Denial Letter, was May 13 to August 13, 2018. *Id.* Reliance then determined that Dr. Jacobs "ceased working for [MedStar] on September 17, 2018 due to a gastric sleeve leak." *Id.* Reliance pointed to medical records showing that Dr. Jacobs had received treatment for the gastric sleeve leak during the look-back period. *Id.* Specifically, Reliance cited records reflecting that Dr. Jacobs was hospitalized "from March 21, 2018 through May 16, 2018

19

and . . . was readmitted to the hospital on May 19, 2018 for complications of gastric resection including a gastric leak, cutaneous fistula and peritoneal abscess." *Id.*  Thus, because Reliance concluded that Dr. Jacobs' disabling condition "was 'caused by, contributed to by, or related to' a Pre-Existing Condition," he was denied disability benefits.  *Id.*[7]

Dr. Jacobs moved for reconsideration on March 23, 2020, arguing that Reliance had "used a different reason" to deny his claim "than was advanced in the initial denial and also relied on a faulty recitation of the facts."  *Id.* at 329–33.  He charged Reliance with "concoct[ing] an ex post facto reason for denial" of his claim and appeared to argue that the Pre-existing Conditions Limitation no longer applied because he had been employed by MedStar since 2014—meaning that the Pre-Existing Conditions Limitation's twelve-month limitation period had long since passed.  *Id.* at 330–31.  Reliance denied reconsideration by letter dated May 7, 2020.  *Id.* at 148.

**D.      The Pending Motions**

Dr. Jacobs filed this action in February 2021.  ECF No. 1.  Reliance answered the complaint in March 2021, ECF No. 5, and, following an unfruitful mediation, both parties moved for judgment in their favor, ECF Nos. 16–21.  That briefing was completed on February 25, 2022, and those motions are now ripe for adjudication.

Dr. Jacobs initially advanced two grounds for judgment in his favor.  *First*, he argued that Reliance violated ERISA's guarantee of "a full and fair review" of his claim by allegedly shifting the rationale for the denial of his claim between the Initial Denial Letter and the Appeal Denial

---

[7] The Appeal Denial Letter misstated the relevant portion of the Reliance Policy's Pre-existing Conditions Limitation. The standard is not whether the Total Disability was merely "caused by, contributed to by, or *related to*" a Pre-Existing Condition.  ECF No. 11-1 at 145 (emphasis added).  That would be a low bar, indeed.  Rather, the Policy requires that the Total Disability be "caused by, contributed to by, or *resulting from*" a Pre-Existing Condition.  *Id.* at 26 (emphasis added).  However, later in the Appeal Denial Letter, Reliance uses the correct language.  *See* ECF No. 11-1 at 145.  In any case, because the undersigned reviews Reliance's decision to deny benefits de novo, the misstatement of the Pre-existing Conditions Limitation standard and any impact it had on Reliance's decision to deny benefits need not be addressed further.

Letter. ECF No. 17-1 at 10–11. And *second*, that Reliance improperly invoked the Pre-Existing Conditions Limitation to deny his claim. *Id.* at 11–14. On this latter point, Dr. Jacobs makes several arguments. To start, he says that the "Transfer of Insurance Coverage" language in the Reliance Policy "ensur[ed] that there would not be preexisting condition invocations for long term employees." *Id.* at 11. He then claims that Reliance found that "he was not actively at work" on July 1, 2018, and that the Reliance Policy's use of the word "active" is fatally ambiguous. *Id.* at 12–13. He then pivots back to the Transfer of Insurance Coverage provision and, this time, merely says that it "ensure[d] coverage." *Id.* at 13. Finally, Dr. Jacobs contends that the Pre-existing Conditions Limitation Credit provision is inapplicable because he was insured under the Guardian Policy since 2014. *Id.* at 13–14.

Reliance, of course, disagrees and urges the Court to enter judgment in its favor. Dr. Jacobs' procedural argument is all wrong, Reliance argues, because it did not, in fact, change its reasoning for denying his claim between the Initial Denial Letter and the Appeal Denial Letter. ECF No. 18-1 at 10–13. In both instances, Reliance explains, it denied Dr. Jacobs' claim under the Reliance Policy's Pre-existing Conditions Limitation—not because Dr. Jacobs was ineligible for coverage. *Id.* As to the denial itself, Reliance says the Pre-existing Conditions Limitation was properly applied because (i) the condition that Dr. Jacobs claimed was disabling was a condition for which he sought treatment in the three months prior to the effective date of his coverage under the Reliance Policy, and (ii) Dr. Jacobs claimed he became disabled within the first twelve months of his coverage under the Reliance Policy. ECF No. 16-1 at 14–18.

In reply, Dr. Jacobs acknowledges that the Initial Denial Letter and the Appeal Denial Letter rested on the same analytical ground and withdraws his claim that the denials were inconsistent. ECF No. 21 at 1–2. He does not, however, concede that Reliance's invocation of

21

the Pre-existing Conditions Limitation was proper.  Importantly, Dr. Jacobs does not meaningfully contest that he sought treatment for his disabling condition during the three-month look-back period.  Instead, he asserts that the Pre-existing Conditions Limitation does not apply at all because he should have received credit toward the twelve-month limitation period under the Policy's Pre-existing Condition Limitation Credit by virtue of his prior coverage under the Guardian Policy, which began in June 2014.  ECF No. 17-1 at 13–14.  As explained, the Reliance Policy's Pre-existing Conditions Limitation Credit provision states that "[i]f an employee is an Eligible Person on the Effective Date of this Policy, any time used to satisfy the Pre-existing Conditions Limitation of the prior group long term disability insurance plan will be credited towards the satisfaction of the Pre-existing Conditions Limitation of this Policy."  ECF No. 11-1 at 14.  The key language here is the "[i]f an employee is an Eligible Person on the Effective Date of this Policy" clause.  Again, the "Effective Date" of the Reliance Policy, as stated in the Policy, is "January 1, 2011, as amended through February 1, 2018."  *Id.* at 1.

In response, Reliance argues that the Pre-existing Conditions Limitation Credit provision has no force because Dr. Jacobs was not "an Eligible Person on the Effective Date" of the Reliance Policy.  Reliance interprets the Policy's Effective Date as January 1, 2011—three-and-a-half years before Dr. Jacobs was even employed by MedStar.  *See, e.g.*, ECF No. 16-1 at 17.  Reliance also contends that because Dr. Jacobs was a resident through June 2018, he was not an "Eligible Person" under the Reliance Policy which excludes coverage for residents.  *See, e.g.*, ECF No. 20 at 7.  As to the "Eligible Person" requirement, Dr. Jacobs does not dispute that he was a resident up until July 1, 2018.  *See, e.g.*, ECF No. 17-1 at 1.  With respect to the Policy's "Effective Date," Dr. Jacobs is more equivocal, stating "there is no way to adequately understand what the policy effective date is."  ECF No. 19 at 4.  He does not explain what, exactly, he believes is the true

"Effective Date" of the Reliance Policy, but suggests that it could be February 1, 2018, or June 4, 2018, and ultimately argues that because Reliance wrote the Policy, its language should be construed against it and in his favor. *Id.* at 4–6.[8]

## IV.  CONCLUSIONS OF LAW

With Dr. Jacobs withdrawing his process argument that Reliance altered the basis on which it denied his claim between the first and second denials, there is but a single, overarching question to be decided:  Whether Reliance properly denied Dr. Jacobs' claim under the Pre-existing Conditions Limitation.  That inquiry is two-pronged:  Whether the Reliance Policy's Pre-Existing Conditions Limitation applied to Dr. Jacobs, and, if so, whether it was applied properly to his claim.  Because both questions should be answered in the affirmative, the undersigned recommends entering judgment in Reliance's favor.

### A.  Choice of Law

First, however, there is the question of which law is applicable in this dispute.  Although the Reliance Policy states that it is "delivered in Maryland and is governed by its laws," ECF No. 11-1 at 1, "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan." *Prudential Ins. Co. of Am. v. Doe*, 140 F.3d 785, 791 (8th Cir. 1998); *see also Morton v. Smith*, 91 F.3d 867, 871 (7th Cir. 1996) (finding that the parties' choice-of-law provision did not control because the "federal common law of ERISA preempts most state law in regulating the interpretation of benefit plans"); *Bliss v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 132 F. Supp. 3d 676, 680 n.2 (D. Md. 2015); *Yasko v. Reliance Standard Life Ins. Co.*, 53 F. Supp. 3d 1059, 1064 n.5 (N.D. Ill. 2014) ("By its terms, the Reliance Policy is governed by Illinois law.

---

[8] Additionally, Dr. Jacobs' reply brief confusingly asserts arguments concerning exhaustion of remedies. ECF No. 21 at 4–7. The undersigned does not understand Reliance to be arguing that Dr. Jacobs failed to exhaust his administrative remedies, and, indeed, Reliance conceded in its Answer that Dr. Jacobs exhausted his remedies. ECF No. 5 at 3. The undersigned will therefore not address Dr. Jacobs' exhaustion of remedies arguments.

23

Because this claim arises under ERISA, however, state laws governing insurance policy interpretation are preempted."). Rather, federal common law should control here. *See, e.g.*, *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 20 n.20 (1983) ("[F]ederal jurisdiction over suits under § [1132] is exclusive, and they are governed entirely by federal common law."); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manor Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 372 n.10 (D.D.C. 2016) (noting that "federal common law . . . governs the interpretation of ERISA plans"); *Bliss*, 132 F. Supp. 3d at 680 n.2. However, in this case the undersigned finds that "[w]hether [the Court] applies Maryland law or federal common law is irrelevant because the principles of contract interpretation are the same" under both. *Bliss*, 132 F. Supp. 3d at 680 n.2; *cf. Stanley v. George Washington Univ.*, 394 F. Supp. 3d 97, 106 n.7 (D.D.C. 2019) ("Because this case turns on general contract principles that equally apply under District of Columbia and federal common law, the Court finds that it would reach the same conclusion irrespective of which law governs."), *aff'd*, 801 F. App'x 792 (D.C. Cir. 2020).

ERISA mandates that terms in benefits plans "be written in a manner calculated to be understood by the average plan participant." 29 U.S.C. § 1022(a)(1). "Under general principles of contract law, specific words and terms are given their ordinary and accepted meaning." *Id.* at 680. Dictionaries are useful in "determin[ing] what meaning a reasonably prudent layperson would attach to a term." *Id.* The intent of the parties is the ultimate inquiry, "with the language of the contract being the primary source for identifying this intent." *Id.* "[T]he intention of the parties is to be ascertained if reasonably possible from the policy as a whole." *Cheney v. Bell Nat. Life. Ins. Co.*, 556 A.2d 1135, 1138 (Md. 1989). Each clause "shall be given force and effect . . . to create a harmonious and coherent whole." *Prince George's Cnty. v. Local Gov't Ins. Trust*, 859

24

A.2d 353, 358 (Md. Ct. Spec. App. 2004), *aff'd*, 879 A.2d 81 (Md. 2005). "Where a term is ambiguous, [the court] must construe it against the drafter, and in accordance with the reasonable expectations of the insured[.]" *Wheeler*, 62 F.3d at 638 (citation omitted).

**B.      Applicability of the Pre-Existing Conditions Limitation to Dr. Jacobs' Claim**

There is no dispute that Dr. Jacobs is totally disabled. The real question to be resolved is whether, as a result of that disability, he has a right to benefits under the Reliance Policy. The threshold inquiry in resolving that issue is whether the Pre-existing Conditions Limitation in the Policy was applicable to Dr. Jacobs' claim for long-term disability benefits, which, by that provision's terms, requires a determination of whether the onset of Dr. Jacobs' total disability arose within the twelve-month limitation period to which the Policy limitation applies. If it did, then the Pre-existing Conditions Limitation would potentially be applicable to his claim, provided its other requirements are satisfied. As explained below, because Dr. Jacobs claimed total disability within weeks of becoming an insured under the Reliance Policy—well-within the twelve-month limitation period—and because that period was not otherwise satisfied pursuant to the Pre-existing Conditions Limitation Credit, the Pre-existing Conditions Limitation may be applied to his claim.

1.      Application of the Twelve-Month Limitation Period

By its terms, the Pre-Existing Conditions Limitation is *not* applicable if the onset of Dr. Jacobs' total disability arose after "the Insured has been Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured." ECF No. 11-1 at 26. Thus, the twelve-month limitation period began to run on the date Dr. Jacobs became an "Insured." *Id*. The parties disagree when, exactly, Dr. Jacobs became an "Insured," but because Dr. Jacobs claimed total disability within weeks of either possible "Insured" date proposed by the parties, it is a dispute that makes no difference.

The Reliance Policy defines "Insured" as "a person who meets the Eligibility Requirements of this Policy and is enrolled for this insurance." *Id.* at 11.  Reliance says that, under that definition, Dr. Jacobs became an "Insured" on August 13, 2018—the first day he was "Actively at Work" as a member of an eligible class under the Policy, i.e., as a physician for Georgetown Physicians Group.[9]  *See, e.g.*, ECF No. 18-1 at 14.  Thus, using August 13, 2018 as the "Insured" date, to avoid application of the Pre-existing Conditions Limitation, Dr. Jacobs would have had to seek total disability *after* he had been "Actively at Work" for one full day following a period of twelve months after August 13, 2018–i.e., on or about August 14, 2019.  Dr. Jacobs, on the other hand, contends that his "[p]lan became effective on his employment as a Physician on July 1, 2018." ECF No. 19 at 2.  In that scenario, the Pre-existing Conditions Limitation would not apply if Dr. Jacobs' total disability arose after he had been "Actively at Work" for one full day *after* July 2, 2019.  Under either interpretation, the timing does not line up for Dr. Jacobs.  It is undisputed that he stopped working and claimed total disability in September 2018—within weeks of becoming an insured under either date proposed by the parties and well short of the twelve-month mark needed to avoid application of the Pre-existing Conditions Limitation—and has not worked since. ECF No. 16-1 at 5; ECF No. 17-1 at 1.  Thus, under either interpretation, Dr. Jacobs' claim of total disability falls within the twelve-month limitation period which would permit application of the Limitation to his claim.

---

[9] Recall that Dr. Jacobs became eligible for coverage under one of the Reliance Policy's eligible classes on July 1, 2018, the date of his hire as an Internal Medicine physician with Georgetown Physician's Group.  That placed Dr. Jacobs into Class 8 of the Reliance Policy's eligible classes.  ECF No. 11-1 at 7 (stating that Class 8 covers "active, Full-time employee of Georgetown Physicians Group").

2.       The Pre-existing Conditions Limitation Credit

But, under the Policy, there is more than one way for the policyholder to satisfy the twelve-month limitation period. Another Policy provision—the Pre-existing Conditions Limitation Credit—provides that:

> If an employee is an Eligible Person on the Effective Date of this Policy, any time used to satisfy the Pre-existing Conditions Limitation of the prior group long term disability insurance plan will be credited towards the satisfaction of the Pre-existing Conditions Limitation of this Policy.

ECF No. 11-1 at 14. Dr. Jacobs argues that because he was covered by the Guardian Policy for several years before becoming covered under the Reliance Policy, he should be credited that time to satisfy the twelve-month limitation period and avoid application of the Reliance Policy's Pre-existing Conditions Limitation. But for that to happen, by the Credit provision's own terms, Dr. Jacobs would had to have been "an Eligible Person on the Effective Date" of the Reliance Policy. *Id.* As explained below, he was not.

The analysis begins, as it must, with the Reliance Policy's text. Unfortunately, the operative Policy language is less than plain. The Policy defines its "Effective Date" as "January 1, 2011, as amended through February 1, 2018." ECF No. 11-1 at 1. That enigmatic phrase would appear subject to multiple reasonable interpretations, including a Policy Effective Date of either January 1, 2011, or February 1, 2018. The parties shed little light on its proper interpretation, and neither offers any extrinsic evidence to divine its meaning. Defendant flatly asserts the phrase means the Policy's Effective Date is January 1, 2011. *See, e.g.*, ECF No. 20 at 6. It does not, however, cite any cases or other authority to support that conclusion, reasoning only that if Reliance had intended February 1, 2018, to be the Policy's Effective Date, it would not have bothered to include the January 1, 2011 date. *Id.* Dr. Jacobs disagrees and appears to suggest two alternative Effective Dates. Although it is not entirely clear from his briefs, he seems to posit that

27

the Effective Date could be "February 1, 2018," which he suggests is the date of the most recent amendment of the Reliance Policy. ECF No. 19 at 3–4. He also refers to Policy language stating that the Policy was "issued on June 4, 2018." *Id.* Ultimately, Dr. Jacobs argues that the Policy's "Effective Date" is "unknowable" and that the ambiguity should be construed against Reliance consistent with the principle of *contra proferentem*.[10] ECF No. 19 at 3–6.

Yet even if Dr. Jacobs is correct that the "Effective Date" language is ambiguous—and that is a reasonable conclusion given that it contains two possible dates—and should be construed against Reliance, he still does not prevail. The *contra proferentem* principle holds that "ambiguous language in a contract that is not clarified by extrinsic evidence or interpretive aids is construed against a party to the contract when that party drafted the language in question." *Impac Mortg. Holdings, Inc. v. Timm*, 255 A.3d 89, 97 (Md. 2021); *see also Fitts v. Unum Life Ins. Co. of Am.*, No. 98-cv-617, 2006 WL 449299, at *3 (D.D.C. Feb. 23, 2006) ("While *contra proferentem* is a state law doctrine of contract interpretation, it has been applied in the ERISA context as a matter of federal common law."), *vacated and remanded on other grounds*, 520 F.3d 499 (D.C. Cir. 2008). Here, Reliance does not contest that it was the drafter of the "Effective Date" language in its policy. Applying *contra proferentem*, however, does not license a court to bend an insurance contract as much as is necessary to cement the insured's victory. Indeed, "[w]hile ambiguous contracts are generally construed against their drafter, '[t]he general rule of construing an ambiguous contract against the drafter does not mean automatically holding in favor of the other

---

[10] Dr. Jacobs also refers to Maryland cases standing for the proposition that "every renewal of a policy of insurance is a new contract." *Id.* But as Reliance points out, those cases are not particularly helpful here because there is no evidence the Reliance Policy was ever "renewed." ECF No. 20 at 6–7. On the contrary, the Policy provides that it "stays in effect as long as [the] Premium is paid when due." ECF No. 11-1 at 1. So, if the premiums are paid (and there is no indication they were not), the Policy would continue in perpetuity without renewal. *See Arrington v. Sun Life Assurance Co. of Canada*, No. 18-cv-563, 2019 WL 2571160, at *5 (D. Md. June 21, 2019) ("[T]he plain language of the Policy contemplates that it continues in effect, not that it is renewed, so long as the premium is paid before or during the grace period.").

party.'" *Equinor USA Onshore Properties Inc. v. Pine Res., LLC*, 917 F.3d 807, 817 n.4 (4th Cir. 2019) (second alteration in original) (quoting *W. Va. Inv. Mgmt. Bd. v. Variable Annuity Life Ins. Co.*, 820 S.E.2d 416, 430 n.46 (W. Va. 2018)); *see also Hall v. Life Ins. Co. of N. Am.*, 317 F.3d 773, 776 (7th Cir. 2003) (noting that the *contra proferentem* rule does not require a "pro-insured decision in every case"); *Colford v. Chubb Ins. Co.*, 687 A.2d 609, 614 (Me. 1996) (holding that the *contra proferentem* principle does not mean that the insured must prevail every time that the insured and the insurer "disagree on the meaning of the contract"); Paul Sullivan & Jeffrey Gordon, *Contra Proferentem Doesn't Always Mean "Against the Insurer"*, JDSUPRA (July 21, 2016) ("Contrary to what sometimes appears to be common understanding, the English translation of the Latin phrase *contra proferentem* is not 'the insurance company loses.'"), https://www.jdsupra.com/legalnews/contra-proferentem-doesn-t-always-mean-89102/.  Thus, the principle does not compel the interpretation of the Reliance Policy's Effective Date in such a way that permits Dr. Jacobs to avoid the Pre-existing Conditions Limitation. Rather, all *contra proferentem* means is that, between the interpretations of the Effective Date provision offered— Reliance proffers January 1, 2011, while Dr. Jacobs suggests either February 1, 2018, or June 4, 2018—the Court should side with Dr. Jacobs' dates.  And that is what the undersigned recommends here.

But even if the Effective Date of the Reliance Policy were either of the dates suggested by Dr. Jacobs, he still could not invoke the Pre-existing Conditions Limitation Credit.  Again, that provision is only applicable "[i]f an employee is an Eligible Person on the Effective Date of this Policy." ECF No. 11-1 at 14.  It is undisputed that Dr. Jacobs was not an "Eligible Person" covered by the Reliance policy until, at earliest, July 1, 2018, when he was first employed as an Internal Medicine physician in MedStar's Georgetown Physicians Group.  ECF No. 16-1 at 7; ECF No.

17-1 at 1.  By virtue of his status as a physician on that date, Dr. Jacobs fell into Class 8 of the "Eligible Classes" covered by Reliance's Policy—defined as an "active, Full-time employee of Georgetown Physicians Group."  ECF No. 16-1 at 10; ECF No. 17-1 at 2.  Prior to that date, it is undisputed that he was a medical resident, which were not eligible for coverage under the Reliance Policy.  ECF No. 11-1 at 7, 135; ECF No. 16-1 at 7; ECF No. 19 at 2–3 (reflecting no dispute to Reliance's statement that "[a]mong those excluded from coverage under the Reliance Standard Policy are Residents").  Thus, even using the latest Policy Effective Date proposed by Dr. Jacobs— June 4, 2018—he still could not benefit from the Pre-existing Conditions Limitation Credit as he was not a "Eligible Person" covered by the Reliance Policy on that date.  ECF No. 19 at 4.  Indeed, he would not become an "Eligible Person" until nearly a month later when he began work as a physician with the Georgetown Physicians Group. Thus, even assuming that the time he accrued as an insured under the Guardian Policy would be creditable towards the twelve-month limitations period pursuant to the Pre-existing Conditions Limitation Credit—an issue the Court need not decide[11]—the Credit provision is otherwise inapplicable to his claim as he was not an Eligible Person on June 4, 2018, or any other possible Effective Date advanced by Dr. Jacobs in this litigation.  And because he cannot credit his time as an insured under the Guardian Policy, the Court should conclude that the Reliance Policy's Pre-existing Conditions Limitation is applicable to his total disability claim as it arose during that provision's twelve-month limitation period, as explained in Section IV.B.1 *supra*.

---

[11] The parties dispute whether the Guardian Policy is a "prior group long term disability insurance plan," as that phrase is used in the Pre-existing Conditions Limitation Credit.  ECF No. 11-1 at 14.  Because the Credit is otherwise inapplicable to Dr. Jacobs' disability claim as he was not an Eligible Person covered by the Reliance Policy on its Effective Date, it is unnecessary for the Court to resolve that issue.

C.      **Reliance Properly Construed the Pre-Existing Conditions Limitation to Deny Dr. Jacobs' Claim**

Having determined that the Pre-existing Conditions Limitation is applicable to Dr. Jacobs' claim as his total disability arose during the twelve-month limitation period, the only remaining question is whether Reliance properly applied the other terms of the Limitation to deny his claim. Again, the Limitation provides that, in pertinent part:

> Benefits will not be paid for a Total Disability:  (1) caused by; (2) contributed to by; or (3) resulting from a Pre-existing Condition unless the Insured has been Actively at Work for one (1) full day following the end of twelve (12) consecutive months from the date he/she became an Insured.  "Pre-Existing Condition" means any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines, during the three (3) months immediately prior to the Insured's effective date of insurance. . . .

ECF No. 11-1 at 26.  Thus, the Limitation provides that Reliance will not pay benefits for a (1) "Total Disability" (2) caused by, contributed to by, or resulting from "a Pre-existing Condition," which is defined as (3) "any Sickness or Injury" (4) "for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" (5) during the "three . . . months immediately prior to the Insured's effective date of Insurance."  *Id.*  Each of these requirements will be addressed below.  The undersigned concludes that each condition is satisfied here, and therefore finds that Reliance properly denied Dr. Jacobs' claim pursuant to the Pre-existing Conditions Limitation.

1.      Total Disability

To start, there is no dispute that Dr. Jacobs is totally disabled due to what he termed "post gastric sleeve leak with infection."  *Id.* at 150.  Indeed, in its Appeal Denial Letter, Reliance repeatedly stated that it was "not disputing [Dr. Jacobs'] impairment status."  *Id.* at 143, 145.

31

2.      Pre-Existing Condition

a.      *Sickness or Injury*

The next question is whether Dr. Jacobs had a "Pre-existing Condition," which requires the insured to have a "Sickness or Injury." *Id.* at 26.  The Initial Denial Letter and Appeal Denial Letter indicate that Reliance considered Plaintiff's complications from gastric sleeve surgery to be a "Sickness" and not an "Injury." *Id.* at 136 ("[Y]our Sickness is considered to be Pre-existing and your claim for [long-term disability] benefits must be denied."); 144–145 (characterizing Dr. Jacobs' condition as a "sickness").  The parties do not address this issue, but the undersigned agrees that Dr. Jacobs' ailments constituted a "Sickness."

The Policy defines "Sickness" as an "illness or disease causing Total Disability which first manifested while insurance coverage is in effect for the Insured."[12]  *Id.* at 12.  Neither "illness" nor "disease" are further defined in the Policy, but a "disease" is commonly understood to mean a "deviation from the healthy and normal functioning of the body."  *Disease*, Black's Law Dictionary (11th ed. 2019).  The undisputed complications stemming from Dr. Jacobs' gastric sleeve surgery, including infections, abscesses, and fluid leakage in his abdomen, were no doubt "deviation[s] from the healthy and normal functioning of" his body.  *See, e.g.*, ECF No. 11-1 at 301–02.  Additionally, to be a "Sickness," these health issues had to "caus[e] Total Disability which first manifested while insurance coverage is in effect for the Insured."  *Id.* at 12.  Here, while it appears that Dr. Jacobs' surgical complications caused some sickness and even some form of disability prior to his coverage under the Reliance Policy,[13] there is no indication that those

---

[12] Read in context, the phrase "first manifested" modifies "Total Disability," not "illness" or "disease."  Read the opposite way, the "illness or disease" would have to have "first manifested while insurance coverage is in effect for the Insured," which would defeat the purpose of the Pre-existing Conditions Limitation.

[13] Indeed, Reliance concedes that, prior to his coverage under its Policy, Dr. Jacobs was "receiving disability benefits from Guardian." *See, e.g.*, ECF No. 16-1 at 8.

complications rendered him "Totally Disabled" before he became covered by Reliance on, at the latest, September 8, 2018.  So, while *some* level of disability arose prior to Dr. Jacobs' coverage by Reliance, he concedes that he returned to work for Georgetown Physicians Group and began treating patients on, at the latest, September 8, 2018, *see, e.g.*, ECF No. 17-1 at 1 (stating that Dr. Jacobs "returned to his duties, this time as a physician, on September 8[, 2018]"), 9 (same), indicating that whatever disability had manifested prior to his coverage under the Reliance Policy was not "[t]otal."  Indeed, it was not until September 17, 2018—the date Dr. Jacobs submitted his disability benefits application—that he claimed he was totally disabled.  ECF No. 11-1 at 149–50. Thus, Dr. Jacobs' post-surgical complications qualified as a "Sickness."

### b.        Treatment During the Three-Month Look-Back Period

To trigger the Policy's Pre-existing Conditions Limitation, Dr. Jacobs must also have "received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" for the Sickness "during the three (3) months immediately prior to [his] effective date of Insurance."  ECF No. 11-1 at 26.  To make the determination, the undersigned will first ascertain Dr. Jacobs' "effective date of Insurance," then calculate the three-month "look-back" period, and, finally, assess whether Dr. Jacobs received "Treatment" or other medical care or diagnostic procedures for his surgical complications during that time.

### i.        Effective Date of Insurance

The Reliance Policy provides two ways to determine an insured's effective date of Insurance.  *See Wallace v. Beaumont Healthcare Emp. Welfare Benefit Plan*, No. 16-cv-10625, 2017 WL 4987675, at *3 (E.D. Mich. Nov. 2, 2017) (assessing the "effective date of Insurance" in a Reliance insurance policy with identical language), *vacated and remanded on other grounds sub nom. Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879 (6th Cir. 2020).  The first is under

33

the provisions set forth in the Policy's "Effective Date of Individual Insurance" provision.  ECF No. 11-1 at 18.  The second is under the Policy's Transfer of Insurance Coverage provision.  If the Transfer provision applies, the insured's "effective date of Insurance" will "coincide with the effective date of the" Policy itself.  *Wallace*, 954 F.3d at 891–92 (assessing the identical coverage transfer provision in an insurance policy issued by Reliance).  This option would have the benefit to Dr. Jacobs of triggering the start of the three-month look-back period years before he received any medical treatment, thereby avoiding application of the Pre-existing Conditions Limitation to his claim.

Unfortunately for Dr. Jacobs, the latter option can quickly be ruled out.  For the Policy's Transfer of Insurance Coverage provision to apply, its first paragraph requires, among other things, that the insured "meet[] all of the requirements for being an Eligible Person under this Policy on its Effective Date."  ECF No. 11-1 at 14.  For the reasons already explained, it is impossible for Dr. Jacobs to have been an "Eligible Person" on the Reliance Policy's "Effective Date" even when using the possible Effective Date most favorable to him—June 4, 2018.  *See* Section IV.B.2 *supra*.  The second paragraph in the Transfer of Insurance Coverage section similarly requires the insured to "otherwise qualify as an Eligible Person" "as of the policy's effective date."  ECF No. 11-1 at 14; *Miller*, 999 F.3d at 284 (interpreting an identical provision to require that the employee "show that he was an [Eligible Person . . . as of the policy's effective date").  Again, Dr. Jacobs does not satisfy that condition because he was not an "Eligible Person" as of the Reliance Policy's Effective Date.[14,15]  So, the Policy's Transfer of Insurance Coverage provision has no application here in

---

[14] Dr. Jacobs also mentions in passing the Reliance Policy's Waiting Period and Waiting Period Credit.  But neither of those provisions are at issue here because Reliance found that Dr. Jacobs had satisfied the Policy's Waiting Period and did not deny his claim on that basis.  ECF No. 11-1 at 135.

[15] More, and as Reliance sets forth, it does not appear that the Transfer provision was ever meant to apply in a case like this.  *See* ECF No. 18-1 at 15.  The Transfer provision seems to have been crafted to ensure that employees are not left in the lurch when the employer ends its coverage with one insurer and switches coverage to Reliance—not

determining Dr. Jacobs' "effective date of Insurance" for triggering the Pre-existing Conditions Limitation's three-month look-back period.   ECF No. 11-1 at 26 (defining "Pre-existing Condition" to mean "any Sickness . . . for which the Insured received medical Treatment . . . during the three (3) months immediately prior to [his] effective date of Insurance").

Rather, to ascertain the start of the Limitation's three-month look-back period, Dr. Jacobs' "effective date of Insurance" must be determined by the Policy's "Effective Date of Individual Insurance" provision.   As relevant here, that provision states that "[t]he insurance for an Eligible Person will not go into effect on a date he/she is not Actively at Work because of a Sickness or Injury.   The insurance will go into effect after the person is Actively at Work for one (1) full day in an Eligible Class[.]"   *Id.* at 18.   As applied to Dr. Jacobs, this language means that, although he was employed as a physician with Georgetown Physicians Group starting on July 1, 2018, his insurance under the Reliance Policy did not go into effect until the first days he was "Actively at Work" as a physician, and not on leave for a "Sickness."   It is undisputed that Dr. Jacobs did not actually begin work as a physician on July 1, 2018, because of his continued complications from the gastric sleeve surgery—which, as explained, is a "Sickness."   ECF No. 17-1 at 3; ECF No. 18-1 at 14.   That much the parties agree on.   What they dispute is the date Dr. Jacobs ultimately returned from sick leave and was "Actively at Work" as a physician.   The Policy defines "Actively at Work" as "actually performing on a Full-time or Part-time basis the material duties pertaining to his/her job in the place where and the manner in which the job is normally performed."   ECF No. 11-1 at 11.   Reliance says Dr. Jacobs was "Actively at Work" by August 13, 2018, but the

when, as here, the employer (MedStar) maintains two different insurance policies (one through Guardian and one through Reliance) for two different categories of employees (residents and full-time physicians) and an employee switches from one category to the other.   *Id.* at 15–16; *see also* ECF No. 20 at 5 (suggesting that the real blame for the application of the Pre-existing Conditions Limitation falls on MedStar, which "decided to insure Residents under a policy from Guardian Life Insurance Company and Georgetown Physicians Group under the separate Reliance Standard Policy").

35

administrative record does not make clear why that date is the correct one. *See, e.g.*, ECF No. 18-1 at 14. In any event, Dr. Jacobs concedes that he returned to work by September 8, 2018. ECF No. 17-1 at 1 (stating that Dr. Jacobs "returned to his duties, this time as a physician, on September 8[, 2018]"), 9 (same). Yet again, however, this is a dispute without a difference. As discussed below, using either August 13, 2018, or September 8, 2018 as Dr. Jacobs' "effective date of Insurance" does not change the outcome because he received treatment and other medical care for his surgical complications within three months of either date.

ii.      Treatment or Other Medical Care

Using the "effective date of Insurance" proffered by Reliance, Dr. Jacobs was "Actively at Work" by August 13, 2018. Three months prior to that date is May 13, 2018. So, under Reliance's view, if Dr. Jacobs received "Treatment" or other medical care for his surgical complications between May 13 and August 13, 2018, the Pre-existing Conditions Limitation applied. According to the Reliance Policy, "Treatment" is "care consistent with the diagnosis of the Insured's Injury or Sickness that has its purpose of maximizing the Insured's medical improvement. It must be provided by a Physician whose specialty or experience is most appropriate for the Injury or Sickness and conforms with generally accepted medical standards to effectively manage and treat the Insured's Injury or Sickness." ECF No. 11-1 at 12. The administrative record reflects—and Dr. Jacobs does not dispute—that as of May 13, 2018, he was hospitalized for medical issues related to his post-surgical complications. *Id.* at 301–02. He was discharged from the hospital on May 16, but was readmitted on May 19 "for pain management, tube feeding, wound care, and IV antibiotics." *Id.* at 301. Importantly, it appears that the IV antibiotics were meant to treat the several different infections Dr. Jacobs was noted to have at that time. *Id.* Dr. Jacobs concedes that "widespread infections" were among his various post-surgical complications. ECF No. 17-1 at 3

36

(explaining that "widespread infections" were among Dr. Jacobs' "major complications"). Thus, at the very least, the undersigned finds that the IV antibiotics Dr. Jacobs received during his hospital stint beginning on May 19, 2018, were "care consistent with" his "Sickness" of complications from gastric sleeve surgery. Further, during Dr. Jacobs' hospital stay that ended on May 16, the medical records indicate that a drain was placed in his chest to address leaking in his abdomen that, as Dr. Jacobs admits, was one of his many post-surgical complications. ECF No. 11-1 at 302; ECF No. 17-1 at 3 (explaining that "persistent gastric leaks" were among Dr. Jacobs' "major complications"). By June 20, however, that drain had become dislodged, resulting in another hospitalization. ECF No. 11-1 at 302. The undersigned finds that the hospitalization related to the drain was also "care consistent with" Dr. Jacobs' complications from gastric sleeve surgery. On July 11, Dr. Jacobs was again hospitalized to address additional leakage of fluid in his abdomen. *Id.* At that time, a stent was inserted in Dr. Jacobs' chest to address the continued leaking. *Id.* This, too, the undersigned finds, was "care consistent with" Dr. Jacobs' post-surgical complications, which, again, he concedes included "persistent gastric leaks."[16] ECF No. 17-1 at 3. Additionally, CT scans of Dr. Jacobs' chest were taken on July 28, 2018, and August 15, 2018. ECF No. 11-1 at 302–03. Although it is unclear if such imaging constitutes "Treatment" under the Policy, CT scans would appear to be a "diagnostic procedure," which would also trigger the Pre-existing Conditions Limitation. *See* ECF No. 11-1 at 26 ("'Pre-Existing Condition' means

---

[16] To the extent these medical interventions cannot be characterized as "Treatment" as defined by the Reliance Policy, the undersigned nevertheless finds that they constituted "care" and/or "services," which also trigger the Pre-existing Conditions Limitation. *See* ECF No. 11-1 at 26 ("'Pre-Existing Condition' means any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures . . . ."). "Care" is defined as "the provision of physical or psychological comfort to another," Black's Law Dictionary 255 (10th ed. 2014), while "services" are defined as "labor performed in the interest or under the direction of others; specifically, the performance of some useful act or series of acts for the benefit of another, usually for a fee," Black's Law Dictionary 1576 (10th ed. 2014). The medical interventions performed on Dr. Jacobs in May, June, and July 2018, which included IV antibiotics to address infections and the insertion of a stent in order to prevent additional abdominal leaking, were, at minimum, "some useful act or series of acts for the benefit" of Dr. Jacobs' post-operative complications.

37

any Sickness or Injury for which the Insured received medical Treatment, consultation, care or services, including diagnostic procedures . . . ."); *see also Price v. Shelton*, No. 20-35639, 2021 WL 5298607, at *1 (9th Cir. Nov. 15, 2021) (including "CT scans" in a list of other "diagnostic procedures," including "biopsies" and "x-rays"); *Copes v. Clem*, No. 12-cv-441, 2013 WL 1010362, at *3 (D. Md. Mar. 13, 2013) (similar), *aff'd*, 539 F. App'x 168 (4th Cir. 2013).  The August 2018 scan showed an "abscess cavity" in and around Dr. Jacobs' spleen, and he acknowledges that "abdominal abscesses" were among the "major complications" of the gastric sleeve surgery.  ECF No. 11-1 at 302; ECF No. 17-1 at 3.  So, at minimum, the August 2018 CT scan was a diagnostic procedure related to Dr. Jacobs' "Sickness" (i.e., the post-surgical complications).

In sum, the foregoing medical record makes clear that Dr. Jacobs received "Treatment," consultation, care, services, and/or diagnostic procedures for his post-surgical complications during the three-month look-back period Reliance contends applies, i.e., from May 13, 2018, to August 13, 2018.  Specifically, the IV antibiotics delivered during the May 19, 2018 hospitalization, the June 20, 2018 hospitalization related to the drain dislodgement, the stent inserted during the July 11, 2018 hospitalization, and the August 2018 CT scan revealing an abscess in and around the spleen were all "care consistent with" Dr. Jacobs' Sickness.

And the conclusion is the same even when using the later "effective date of Insurance" Dr. Jacobs suggests.  Dr. Jacobs says he returned to work on September 8, 2018.  ECF No. 17-1 at 1, 9.  Utilizing that date as the "effective date of Insurance," the three-month look-back period would span June 8, 2018, to September 8, 2018.  Although this look-back period would exclude the "Treatment" received during the May 19, 2018 hospitalization, the undersigned finds that it would still include the "Treatment" rendered during Dr. Jacobs' hospitalizations in June 2018 and July

38

2018 and the diagnostic imaging conducted in August 2018.  Thus, the undersigned finds that using either the three-month look-back period based on the "effective date of Insurance" proffered by Reliance or Dr. Jacobs, it is clear from the medical record that Dr. Jacobs "received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines" for his Sickness—complications from gastric sleeve surgery—in the three months immediately preceding the "effective date of Insurance."  ECF No. 11-1 at 26.

Here is where that leaves the analysis:  First, it is undisputed that Dr. Jacobs has a "Total Disability" from "post gastric sleeve leak with infection."  ECF No. 11-1 at 150; *see also id.* at 143 (Reliance stating in its Appeal Denial Letter that it was "not disputing [Dr. Jacobs'] impairment status."), 145 (same).  Second, the undersigned finds that Dr. Jacobs' complications from gastric sleeve surgery are a "Sickness," and he received "Treatment" and/or diagnostic procedures for that condition in the three months prior to his "effective date of Insurance."  *Id.* at 26.  Thus, the complications from gastric sleeve surgery constituted a Pre-existing Condition.  *Id.* All that is left to determine is whether a causal link exists between Dr. Jacobs' Total Disability and the Pre-existing Condition.

3.    Causal Connection between the Total Disability and Pre-existing Condition

For the Pre-existing Conditions Limitation to apply, the claimant's Total Disability must be "caused by, contributed to by, or resulting from" a Pre-existing Condition.  *Id.*  "[S]trictly construed," such language precludes "coverage if any pre-existing health conditions in some way—no matter how remote—might have contributed to the loss."  *Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 608 (11th Cir. 2017) (construing identical language in another Reliance policy).  Under that standard, there is no question that Dr. Jacobs' disabling condition—"post gastric sleeve leak with infection," ECF No.11-1 at 150—was, at the very least,

39

contributed to by the complications stemming from his gastric sleeve surgery.  Indeed, the total disability and the pre-existing condition are one and the same.  That is, the disabling leaking in Dr. Jacobs' abdomen and the associated infections (i.e., the basis for his claim of Total Disability) are the same post-gastric sleeve surgical complications for which he was treated in the three months prior to his "effective date of Insurance" (i.e., his Pre-existing Condition).  Thus, the undersigned finds that but-for Dr. Jacobs' surgical complications, he would not have experienced leaking and infections in his abdomen, and but-for the leaking and infections, he would not be disabled.

This finding is consistent with decisions that other courts in this District have rendered in similar circumstances.  Reliance's citation to *King v. Liberty Life Assurance Co. of Boston*, 806 F. Supp. 2d 25 (D.D.C. 2011) is particularly apt.  In that case, the plaintiff, a special education teacher, underwent bariatric bypass surgery—a procedure similar to the one Dr. Jacobs underwent. *Id.* at 26.  The surgery resulted in a number of physical and psychological complications, including "anxiety, chronic pain, tiredness, abdominal pain, and nausea." *Id.* at 27.  Following the surgery, the plaintiff stopped working at the school that had employed her and received 24 months of long-term disability benefits. *Id.* at 26.  After she exhausted her benefits, the plaintiff found work at another school. *Id.* at 26–27.  Several months into her new job, however, the plaintiff again stopped working due to her post-surgical complications and sought long-term disability benefits. *Id.* at 27. Her new employer's insurer denied the claim, invoking its pre-existing conditions limitation which, as here, "exclude[d] from coverage any disability 'caused or contributed by, or resulting from a Pre–Existing Condition.'" *Id.* at 28, 30 (citing the record).  The plaintiff brought suit, alleging that the defendant insurer breached its obligation to provide her with disability benefits. *Id.* at 25–26.  The court disagreed and affirmed the insurer's denial of benefits. *Id.* at 30–31. Importantly, the court found that the plaintiff's "post-bariatric conditions" constituted a pre-

40

existing condition under a similar standard as that found in the Reliance Policy. *Id.* at 30. And, as in this case, the court found that the "symptoms for which [the plaintiff] claimed a disability were caused by the post-bariatric condition." *Id.* The result should be no different here.

Notably, other courts outside this Circuit interpreting identical language as in the Reliance Policy have found that the "caused by; contributed to by; or resulting from" clause must be interpreted "to exclude coverage for only those losses *substantially* caused by, *substantially* contributed to by, or *substantially* resulting from a pre-existing condition."[17] *See, e.g.*, *Bradshaw*, 707 F. App'x at 608; *see also Fought v. UNUM Life Ins. Co. of Am.*, 379 F.3d 997 (10th Cir. 2004) (reaching a similar conclusion in a case featuring comparable exclusionary language). Even imposing that more demanding construction of the contract, Reliance still properly denied Dr. Jacobs' claim. Under the "substantially contributed" standard, it is not enough that Dr. Jacobs' post-surgical complications were a but-for cause of his Total Disability. If too many "links" are required to connect the Total Disability with his Pre-existing Condition, the latter will not have "substantially contributed" to the former. *See, e.g.*, *Bradshaw*, 707 F. App'x at 608 ("Connecting [plaintiff's pre-existing condition] during the look-back period to her ultimate disabling condition requires four links. On this record, that's too many."); *Fought*, 379 F.3d at 1010 (finding five intervening stages between disease and disability to be too attenuated in case involving a similarly-worded pre-existing condition limitation). At bottom, under that standard, Reliance "must demonstrate that the proximate cause of the disability, here, the [gastric leaking and infections], was a pre-existing condition." *Fought*, 379 F.3d at 1013.

---

[17] Some courts have declined to so interpret the "caused by, contributed to by, or resulting from language," reasoning that superimposing such gloss "would require the court to deviate from the plain language of the" disability plan. *See, e.g.*, *Rutledge v. Life & Accidental Death & Dismemberment Plan*, No. 2:05-cv-936, 2006 WL 3522932, at *9 (S.D.W. Va. Dec. 6, 2006).

On these facts, no logical leap need be made between Dr. Jacobs' "Pre-existing Condition"—the complications from his gastric sleeve surgery—and his "Total Disability"—which he says was caused by "post gastric sleeve leak with infection"—because, again, they are one and the same. Dr. Jacobs acknowledges that his post-surgical complications included gastric leaking, infections, and abdominal abscesses. ECF No. 17-1 at 3. He cited the "leak[ing]" and "infection[s]" as reasons for his disability. ECF No. 11-1 at 150. Thus, because the ailments causing Dr. Jacobs' total disability are among the cascade of complications he suffered following the gastric sleeve surgery, it is not difficult to conclude that those complications "substantially contributed" to his total disability. In other words, the "proximate cause" of his disability—the abdominal leaking and infections—were pre-existing conditions because they are "deviation[s] from the healthy and normal functioning of the body" (i.e., a "Sickness") for which Dr. Jacobs underwent "medical Treatment, consultation, care or services, including diagnostic procedures" in the three months prior to the effective date of his insurance under the Reliance Policy. *Id.* at 26; *Disease*, Black's Law Dictionary (11th ed. 2019). So, and unlike in *Bradshaw* and *Fought*, Dr. Jacobs' post-surgical complications were not "one in a series of factors that contribute[d] to the disabling condition"—they *were* the factors causing the disability.[18]  *Fought*, 379 F.3d at 1010.

*   *   *   *   *

---

[18] In *Bradshaw*, for example, Reliance attempted to string together a chain of "but-for" causes to tie the plaintiff's pre-existing condition (pregnancy) to her total disability:

> Here, Reliance attempts to make a similar "but-for" argument: it asserts that but for [plaintiff's] pregnancy, she would not have developed high blood pressure; and but for her high blood pressure, she would not have developed preeclampsia; and but for her preeclampsia, she would not have suffered a stroke; and finally, but for her stroke, [plaintiff] would not have become totally disabled.

707 F. App'x at 609. That sort of attenuated causal reasoning is not necessary in this case, where the disabling conditions (gastric leaking and infections) are precisely the same conditions that were diagnosed and treated in the three months prior to Dr. Jacobs' effective date of insurance. Stated another way, there is a direct link between the conditions that comprised Dr. Jacobs' post-surgical complications and the conditions cited for causing his total disability—indeed, the conditions are the same.

In sum, the undersigned finds that Reliance properly applied the Policy's Pre-existing Conditions Limitation to deny Dr. Jacobs' disability claim.

## CONCLUSION

The parties' motions present two key substantive issues.  First, whether the Reliance Policy's Pre-existing Conditions Limitation was applicable to Dr. Jacobs' claim.  The undersigned finds that it was.  And second, whether Reliance construed the Pre-existing Conditions Limitation properly to deny Dr. Jacobs' disability claim.  Again, the undersigned finds that it did.  Thus, the undersigned finds that Reliance carried its burden to show that Dr. Jacobs was not entitled to disability benefits under its Policy.  The undersigned therefore **RECOMMENDS** that Reliance's motion (ECF No. 16) be **GRANTED**, that Dr. Jacobs' motion (ECF No. 17) be **DENIED,** and that judgment be entered for Reliance.

\*     \*     \*     \*     \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Date:  June 6, 2022

                                       _____

                                       G. MICHAEL HARVEY
                                       UNITED STATES MAGISTRATE JUDGE